UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| KUT AND KILL, Inc., | 4:22-CV-04081-KES |
| Plaintiff, | |
| vs. | ORDER DENYING KUT AND KILL, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING UNITED FIRE & CASUALTY COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT |
| UNITED FIRE & CASUALTY COMPANY, | |
| Defendant. | |

Plaintiff, Kut and Kill, Inc., mistakenly applied a broad-spectrum herbicide on its customers' lawns. Docket 19 ¶¶ 9, 11; Docket 34 at 1. After its customers' lawns died, Kut and Kill submitted a claim to its insurance provider, defendant, United Fire & Casualty Company. Docket 27-4 at 3. United Fire initially notified Kut and Kill that it was examining coverage and reserving its rights. *Id.* at 2 (discussing an "updated" reservations of rights letter and referring to a previous discussion). United Fire subsequently sent Kut and Kill a second reservation of rights letter and stated it intended to file a declaratory judgment action. *Id.* at 3-6. Before the declaratory judgment action was filed by United Fire, Kut and Kill sued United Fire, alleging claims for breach of contract (Count I), seeking a declaratory judgment that United Fire has an obligation to defend and indemnify Kut and Kill (Count II), and alleging a breach of good faith and fair dealing (Count III). *See* Docket 1 at 9-10. United Fire denies all liability and raises four counterclaims, including in pertinent

1

part Count 1, which seeks a declaratory judgment that United Fire has no obligation under Coverage A of the insurance policy to defend or indemnify Kut and Kill with respect to its customers' claims. *See* Docket 8 at 11-12, 15-25.

Kut and Kill and United Fire filed cross-motions for partial summary judgment. Docket 18; Docket 23. Kut and Kill does not specify on which counts it moves for summary judgment but appears to move for summary judgment on Count II of its Complaint and Count I of United Fire's Counterclaim. Docket 23. Specifically, Kut and Kill moves the court to declare that Coverage A of the insurance policies at issue applies in this case, including United Fire's duty to defend and pay damages up to the $5,000,000 aggregate limits. *See id.* United Fire moves for partial summary judgment on Count II of the Complaint and Count I of its Counterclaim. Docket 18.

For the following reasons, the court denies Kut and Kill's partial motion for summary judgment in its entirety and grants United Fire's partial motion for summary judgment in its entirety.

## I.     Factual Background

The court recites the following undisputed facts:

Kut and Kill is a South Dakota company that provides lawn care services. Docket 19 ¶ 1; Docket 34 at 1. On or after April 18, 2022, Kut and Kill began applying its "Early Spring Application" to customers' lawns and continued into early May 2022. *See* Docket 19 ¶ 5; Docket 34 at 1. Kut and Kill's "Early Spring Application" is intended to provide a fertilizer and weed pre-emergent in granular form, along with a broadleaf weed herbicide in liquid

2

spray form. *See* Docket 19 ¶ 4; Docket 34 at 1. Kut and Kill applies all three of these products on customers' lawns in the same pass using a mechanical spreader. *See* Docket 19 ¶ 4; Docket 34 at 1.

In early May 2022, Kut and Kill began receiving complaints from customers that lawns on which it had applied the "Early Spring Application" were visibly damaged. *See* Docket 19 ¶ 6; Docket 34 at 1. Approximately 300 customers lawns were allegedly damaged by this "Early Spring Application." *See* Docket 19 ¶ 7; Docket 34 at 1. Kut and Kill discovered that it had inadvertently mixed "Ranger Pro," a non-discriminatory herbicide, instead of the intended weed killer. *See* Docket 19 ¶ 9; Docket 34 at 1.

Ranger Pro is "a complete broad spectrum non-selective post-emergent professional herbicide" that has an active ingredient of 41% glyphosate. *See* Docket 21-4 at 2-3; Docket 19 ¶ 10; Docket 34 at 1. Tate Eining, President of Kut and Kill, has experience working with glyphosate. *See* Docket 26 ¶ 16. Based on Eining's experience, applying water to lawns may help to reduce or even eliminate the effects of inadvertent use of glyphosate. *See* Docket 25 ¶ 6; Docket 31 ¶ 6 (disputing only the materiality of this fact). Eining is aware of at least one instance in which "a property was inadvertently sprayed with glyphosate on 4/22/22, and irrigation was turned on 5/4/22, with no reseeding and resodding, and the grass on that property is and was fully healthy." *See* Docket 25 ¶ 6; Docket 31 ¶ 6 (disputing only the materiality of this fact). Ranger Pro's label indicates that "[r]ainfall within 4 hours of application could wash this product off the foliage and a second application

3

might then be needed to achieve acceptable weed control." Docket 21-4 at 36. This label also notes that the product "moves through the plant from the point of foliage contact to and into the root system." *Id.*

On or about May 9, 2022, Eining notified United Fire of the possibility of numerous claims of property damage arising out of its lawn care services. Docket 19 ¶ 13; Docket 34 at 1. United Fire issued a Commercial General Liability Coverage policy and a Commercial Liability Umbrella Coverage policy (collectively "The Policies") to Kut and Kill. *See* Docket 21-3. As relevant here, the policies have identical terms. *See* Docket 21-3 at 6-7, 10-11, 18, 20-21, 69-70, 72-73, 83-86.[1] The policies were in effect from September 1, 2021 to September 1, 2022. *See id.* at 2, 65.

Numerous Kut and Kill customers wrote letters, made calls, and otherwise made demands of Kut and Kill, seeking to make Kut and Kill liable for the damage to customers' property. *See* Docket 25 ¶¶ 7-8; Docket 31 ¶¶ 7-8. Numerous customers "report[ed] dying grass as the weather turned warm." Docket 25 ¶¶ 7-8; Docket 31 ¶¶ 7-8. Later in May, United Fire responded to Kut and Kill's notice, explaining that it did not believe the damage to the customers' lawns was covered under the policies. *See* Docket 27-4 at 3-6. On

---

[1] Because the policies are identical, the court cites only the Commercial General Liability policy but incorporates its analysis in full with respect to the Umbrella Policy. Most relevant for this order's analysis, the main commercial general liability policy contains exclusions j(6) and l. *See* Docket 27-3 at 10. The identical exclusions in the umbrella policy are m(6) and o, respectively. *See id.* at 29. For purposes of simplicity, the court cites only j(6) and l of the main commercial general liability policy in the body of the opinion, and extends the same analysis to m(6) and o of the umbrella policy.

or about July 6, 2022, Alicia Szczesny, one of Kut and Kill's customers, filed suit in small claims court against Kut and Kill, alleging that "Kut & Kill put a chemical on my lawn that killed the entire yard." *See* Docket 19 ¶ 14; Docket 34 at 1.

For purposes of these cross-motions for summary judgment, the parties dispute the applicability of Coverage A of the policies. *See* Docket 18; Docket 23. Coverage A provides that United Fire "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Docket 21-3 at 6. Coverage A also contains multiple "exclusions" to which Coverage A does not apply. *See id.* at 7-11.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *Morrow v. United States*, 47 F.4th 700, 704 (8th Cir. 2022) (alteration in original) (quoting *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995)). In reviewing the record, the court views the facts in the light most favorable to the non-moving party. *Lissick v. Andersen Corp.*, 996 F.3d 876, 882 (8th Cir. 2021). While "[t]he mere existence of a scintilla of

evidence in support of the [movant's] position will be insufficient[,]" *Turner v. XTO Energy Inc.*, 989 F.3d 625, 627 (8th Cir. 2021) (cleaned up and quotations omitted), a party moving for summary judgment is not entitled to a judgment just because the facts he offers may appear to be more plausible or because the adversary may be unlikely to prevail at trial*, Handeen v. Lemaire*, 112 F.3d 1339, 1354 (8th Cir. 1997).

## III. Applicable Law

"In insurance coverage actions involving diversity of citizenship, state law controls [the court's] analysis of the insurance policy." *Geerdes v. West Bend Mut. Ins. Co.*, 70 F.4th 1125, 1127 (8th Cir. 2023) (quoting *Nat'l Am. Ins. Co. v. W & G, Inc.*, 439 F.3d 943, 945 (8th Cir. 2006)). The state's highest court's decisions on interpreting insurance provisions bind the court. *See GEICO Cas. Co. v. Isaacson*, 932 F.3d 721, 725 (8th Cir. 2019). If the state's highest court has yet to address an issue, the court must predict how the state court would rule. *See id.* at 725-26.

Here, the court is sitting in diversity and both parties agree that South Dakota substantive contract law applies. *See* Docket 1; Docket 20 at 9; Docket 24 at 16 (citing South Dakota Supreme Court decisions in support of how to interpret the policies). Thus, the court applies South Dakota law when interpreting the insurance policies in this case.

## IV. Discussion

"The existence of the rights and obligations of parties to an insurance contract are determined by the language of the contract, which must be

6

construed according to the plain meaning of its terms." *W. Nat'l. Mut. Ins. Co. v. Gateway Bldg. Sys., Inc.*, 887 N.W.2d 887, 890 (S.D. 2016) (citations omitted). The court must follow the plain meaning of a provision. *See State Farm Fire & Cas. Co. v. Harbert*, 741 N.W.2d 228, 234 (S.D. 2007). If the terms of an insurance contract "are fairly susceptible to different interpretations, the interpretation most favorable to the insured should be adopted." *Culhane v. W. Nat'l Mut. Ins. Co.*, 704 N.W.2d 287, 292 (S.D. 2005). The mere "fact that the parties differ as to the contract's interpretation does not create an ambiguity." *Ass Kickin Ranch, LLC, v. N. Star Mut. Ins. Co.*, 822 N.W.2d 724, 727 (S.D. 2012) (quoting *Zochert v. Nat'l Farmers Union Prop. & Cas. Co.*, 576 N.W.2d 531, 532 (S.D. 1998)). "[T]he terms of an unambiguous insurance policy cannot be enlarged or diminished by judicial construction." *Berkley Reg'l. Spec. Ins. Co. v. Dowling Spray Serv.*, 860 N.W.2d 257, 260 (S.D. 2015) (quoting *Am. Fam. Mut. Ins. v. Elliot*, 523 N.W.2d 100, 102 (S.D. 1994)).

"When an insurer invokes a contract exclusion to disallow coverage, the insurer has the burden of proving that the exclusion applies." *W. Agric. Ins. Co. v. Arbab-Azzein*, 940 N.W.2d 865, 868 (S.D. 2020) (citations omitted). "This burden is satisfied when the insurer shows the claim '*clearly* falls outside the policy coverage.' " *Harbert*, 741 N.W.2d at 234 (quoting *State Farm Mut. Auto. Ins. Co. v. Wertz*, 540 N.W.2d 636, 638 (S.D. 1995)). United Fire argues that

two specific exclusions, [2] (j)(6) and l, apply [3] and thus exclude Kut and Kill

from coverage under Coverage A of the policies. *See* Docket 20 at 17-25; Docket

30 at 7-14.

The pertinent parts of Coverage A of the Commercial General Liability

policy are as follow:

SECTION I – COVERAGES
COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

   a. We will pay those sums that the insured becomes legally obligated
      to pay as damages because of "bodily injury" or "property damage"
      to which this insurance applies. . . .

2. Exclusions
   This insurance does not apply to:

   j. Damage To Property
      "Property damage" to:

      (6) That particular part of any property that must be restored,
      repaired or replaced because "your work" was incorrectly
      performed on it.

   Paragraph (6) of this exclusion does not apply to "property damage"
   included in the "products-completed operations hazard."

---

[2] The parties initially dispute whether Coverage A provides coverage to Kut and
Kill. *See* Docket 20 at 10-16; Docket 30 at 6-7; Docket 35 at 13-16; Docket 36
at 2-4. But for the reasons explained below, even if Kut and Kill is
presumptively covered under Coverage A, Kut and Kill is still without coverage
because at least one exclusion applies. Thus, the court need not resolve this
initial issue.

[3] United Fire also argues exclusion j(5) of the main commercial general liability
policy applies (exclusion m(5) of the umbrella policy), but for the reasons below,
the court need not determine whether exclusion j(5) applies because, at the
very least, exclusion j(6) or l applies.

1. Damage to Your Work
"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

SECTION V – DEFINITIONS
16. "Products-completed operations hazard:"
    a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
        (2) Work that has not yet been completed or abandoned. However, "your work: will be deemed completed at the earliest of the following times:
            (a) When all of the work called for in your contract has been completed.
        Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.
22. "Your work":
    a. Means:
        (1) Work or operations performed by you or on your behalf; and
        (2) Materials, parts or equipment furnished in connection with such work or operations.
    b. Includes:
        (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and
        (2) The providing of or failure to provide warnings or instructions.

Docket 21-3 at 6-7, 9-10, 20-21. Any reference to "you" or "your" refers to the named insured, in this case Kut and Kill. *Id.* at 6.

The court will now discuss whether exclusions j(6) and l apply.

**A. Exclusion j(6)**

Exclusion j(6) excludes "property damage" to "[t]hat particular part of any property that must be restored, repaired, or replaced because 'your work' was incorrectly performed on it." Docket 21-3 at 10. "Your work" includes "[w]ork or operations performed by you or on your behalf[.]" *Id.* at 21. Thus, the

critical question is whether Kut and Kill incorrectly performed operations at the time it sprayed the lawns and whether those incorrectly performed operations caused property damage that must be restored, repaired or replaced. Here, Kut and Kill does not dispute that its accidental spraying of glyphosate constitutes property damage that "must be restored, repaired, or replaced." *See* Docket 24 at 20-22 (arguing only that the property damage falls under the products completed operations hazard exception). The parties do not dispute that "[s]ubstantial numbers of Kut and Kill customers wrote letters, made calls, and otherwise made demands of Kut and Kill, seeking to make Kut and Kill liable for costs of the damage to customers' property" or that numerous customers called "reporting dying grass as the weather turned warm." *See* Docket 25 ¶¶ 7-8; Docket 31 ¶¶ 7-8. Thus, the record shows that the customers' lawns constitute property damage that must be restored, repaired, or replaced. *See* Docket 27-3 at 10. Similarly, the record shows that Kut and Kill performed the work on the lawns incorrectly, because both parties agree that Kut and Kill employees mistakenly applied Ranger Pro on customers' lawns. *See* Docket 19 ¶¶ 5, 9; Docket 34 at 1. Thus, Kut and Kill's work on its customers' lawns falls under exclusion j(6).

In *Brake Landscaping & Lawncare, Inc. v. Hawkeye-Security Ins. Co.,* 625 F.3d 1019 (8th Cir. 2010), the Eighth Circuit upheld the district court's application of the j(6) exclusion on facts very similar to the facts present here. The court held "coverage is excluded under subparagraph (6) because in spraying [the insured]'s customers' lawns with non-selective herbicide, [the

10

insured's employee] was incorrectly performing [the insured]'s 'work' and the resultant damage to the lawns is therefore excluded by the clear and unambiguous language of the policy." *Id.* at 1024. Just as in *Brakes*, the court finds exclusion j(6) applies.[4]

## B. Exclusion l

Exclusion l[5] excludes " 'property damage' to 'your work' arising out of it or any part of it and included in the 'products completed operations hazard.' " *Id.* Under Coverage A, "Your work" means: "(1) Work or operations performed by you or on your behalf; and (2) Materials, parts or equipment furnished in connection with such work or operations." Docket 21-3 at 21.

As mentioned above, the parties agree that the damage to the customers' lawns constitutes property damage. But the issue here is whether this property damage is "to [Kut and Kill's ] work[,]" (i.e. whether the customers' lawns in this

---

[4] Kut and Kill argues that the products-completed operations hazard exception to exclusion j(6) applies. *See* Docket 21-3 at 10. The court addresses the exception to this exclusion below.

[5] Kut and Kill repeatedly argues that United Fire raises exclusion l for the first time at the summary judgment stage and did not cite this exclusion in its initial response to Kut and Kill. *See* Docket 35 at 26; Docket 38 at 19; *see also* Docket 27-4 at 3-6 (showing United Fire failed to specifically mention exclusion l in its initial letter to Kut and Kill). But Kut and Kill does not allege nor point to any specific evidence that it was "prejudiced by [United Fire]'s failure to identify Exclusion [l]" as a reason why coverage would not exist, as required for estoppel to apply under South Dakota law. *See Swenson v. Auto Owners Ins. Co.*, 831 N.W.2d 402, 408-09 (S.D. 2013); *Estate of Anderson v. Safeco Ins. Co. of Ill.*, 567 F.3d 404, 407-08 (8th Cir. 2009) (applying state law when determining whether insurance company was estopped from raising an argument that it failed to raise it in its initial denial of coverage). Thus, to the extent Kut and Kill attempts to make an estoppel argument, the court rejects it.

instance count as Kut and Kill's "work"). In other words, the court must determine whether Kut and Kill damaged its own "work" through its work.[6]

Exclusion l's language expressly contemplates a scenario in which an insured damages its own "work" through its work. The exclusion specifically says that it excludes " 'property damage' to 'your work' *arising out of it or any part of it . . . ." Id.* (emphasis added). Reading the provision in context, the word "it" after the phrase "arising out of" refers to "your work," because the only other noun "it" could possibly refer to is "property damage." But if "it" refers to property damage, the provision would provide that the exclusion excludes " 'property damage' to 'your work' arising out of [property damage]     . . . ." *Id.* This reading is nearly non-sensical and thus the court declines to adopt this reading. *See Farm & City Ins. v. Estate of Davis*, 629 N.W.2d 586, 587 (S.D. 2001)("We read and understand insurance contracts according to the *natural and obvious import of the language*, without resorting to subtle and forced construction for the purpose of either limiting or extending their operation." (emphasis added) (quotations omitted)). On the other hand, reading "it" to refer to "your work" results in the provision excluding " 'property damage' to 'your work' *arising out of* [your work]. . . ." The South Dakota Supreme Court has also confirmed this understanding. *See Owners Ins. Co. v. Tibke Constr., Inc.*, 901 N.W.2d 80, 88-89 (S.D. 2017) (interpreting identical exclusion and inserting "your work" in place of "it" in analyzing such exclusion).

---

[6] The court discusses the issue of whether the property damage was included in the products completed operations hazard in a separate section.

Here, Kut and Kill's work was to provide "[a]n effective fertilizer and weed control program" for its customers. Docket 21-5 at 1. Kut and Kill applied the first step of its Early Spring Application that was intended to provide fertilizer and weed control in both granular and liquid spray form. *See* Docket 19 ¶ 4; Docket 34 at 1. Instead, Kut and Kill sprayed glyphosate and killed its customers' entire lawns. *See* Docket 19 ¶¶ 7-9; Docket 34 at 1. As a result, Kut and Kill's spraying of glyphosate damaged Kut and Kill's efforts to provide effective fertilizer and weed control to its customers' lawns. Thus, Kut and Kill's spraying of glyphosate damaged Kut and Kill's work.

Kut and Kill argues that "the claimed damage was to the lawns of Kut and Kill's owners[,]" rather than Kut and Kill's "work," because the lawns "existed before Kut and Kill applied herbicide to them." Docket 35 at 27. Kut and Kill further reasons that its "purpose was only to cultivate what was already there." *Id.* Thus, Kut and Kill argues exclusion l does not apply because Kut and Kill damaged the customers' lawns, not Kut and Kill's work. *See id.*

The court disagrees. While it is true that Kut and Kill's work damaged its customers' lawns, those lawns are necessarily captured in Kut and Kill's work. The fact that the lawns "existed before Kut and Kill applied herbicide to them" and that Kut and Kill's "purpose was only to cultivate what was already there" does nothing to undermine the inherent connection between Kut and Kill's work and the customers' lawns. Once glyphosate killed the grass, Kut and Kill's work of fertilizing and applying a broad-spectrum herbicide to the lawns became inseparable.

The Fifth Circuit's analysis on a similar issue is consistent with the court's opinion in this case. *See Am. Home Assur. Co. v. Cat Tech LLC.*, 660 F.3d 216, 221 (5th Cir. 2011). In *Cat Tech*, Ergon Refining hired Cat Tech L.L.C. to service Ergon's pre-existing reactor. *Id.* at 218. Cat Tech replaced certain catalyst and "reactor internals" of Ergon's reactor. *Id.* Later, the reactor experienced a high pressure drop due to damage to certain components of the reactor, including the reactor internals. *See id.* Cat Tech returned to remove, repair, and replace the damaged internals and loaded additional catalyst. *Id.* The reactor again experienced a large pressure drop. *See id.* Ergon later hired a different contractor to perform repair work, at which point "additional damage to the reactor was discovered[.]" *Id.* at 219.

Interpreting an identical insurance provision to exclusion l here, the Fifth Circuit discussed whether the exclusion for "property damage" to "your work" arising out of it or any part of it applied. *See id.* at 219, 221. Most relevant to this case, the Fifth Circuit considered whether property damage "to the specific parts of Ergon's reactor upon which Cat Tech performed defective work" and property damage "to those parts of the reactor upon which Cat Tech performed non-defective work, but were nonetheless damaged" fell within this exclusion. *See id.* at 221. Similar to Kut and Kill's arguments here, Cat Tech argued that the exclusion precludes coverage "only for damage to its own intangible repairs (which constitutes its "work") and does not exclude damage to third-party property (such as Ergon's reactor) upon which it performed those services." *Id.* at 224. But the Fifth Circuit rejected this argument, reasoning that the

14

exclusion "applies when an insured has damaged third-party property by performing defective repairs or other services on that property." *Id.* Thus, the Fifth Circuit held that the damage to those parts of the reactor upon which Cat Tech performed services fell under the exclusion because damage to that part of the reactor constituted damage to Cat Tech's "work." *See id.*[7]

Just as Ergon hired Cat Tech to repair its reactor, so too did the customers in this case hire Kut and Kill to apply fertilizer and broad-spectrum herbicide to their lawns. And just as Cat Tech damaged its "work" through its repairs to the Ergon reactor, Kut and Kill damaged its "work" when it applied a non-selective post-emergent herbicide to its customers' lawns. *See id.* at 224.

---

[7] The Fifth Circuit referred to the property on which the insured performed defective repairs or services as "third party property." *See Cat Tech L.L.C.*, 660 F.3d at 224. The court recognizes, as Kut and Kill points out, a secondary source, 3 New Appleman on Insurance Law Library Edition § 18.03, states that "[i]t is clear that the damage to the insured's own work, as defined in the contract, is excluded. If, however, a third-party's work or property is damaged as a result of the insured's faulty work, Exclusion 'l' does not bar coverage for that third-party damage." *See* Docket 38 at 21-22. But the use of "third party" in this treatise appears to refer to damage to property belonging to a third party that is not the property upon which the insured was working. The treatise cites *Johnson Landscapes, Inc. v. FCCI Ins. Co.*, 2007 WL 4258233 (N.D.Ga 2007), which involved a subcontractor's construction of a retaining wall that damaged nearby tennis courts. In *Johnson Landscapes*, the insurance company paid for damage to the tennis courts. Thus, the court did not need to address whether the damage to the tennis courts fell under the "your work" exclusion. *See id.* at *2. But assuming the damage to the tennis courts does not count as the insured's work and thus is not excluded, the tennis courts were not the subject of the insured's work. *See id.* at *1. This fact distinguishes *Johnson Landscapes* from the instant case, because the damage to the customers' lawns, unlike the tennis courts, is the property upon which the insured performed services. In any event, to the extent there is a conflict between this secondary source and *Cat Tech*, the court finds the Fifth Circuit's discussion more persuasive.

In both instances, the customers previously owned the damaged items (i.e. the reactor and the lawns). And both cases involve situations in which the damage to the customers' pre-existing property directly damaged the insured's work on such property. Thus, the damages to Kut and Kill's customers' lawns constitutes damage to Kut and Kill's "work" and as a result, falls under exclusion l.

Kut and Kill cites numerous cases to resist this conclusion. Kut and Kill first cites *Esicorp, Inc. v. Liberty Mut. Ins. Co.*, 193 F.3d 966 (8th Cir. 1999), an Eighth Circuit opinion. *See* Docket 35 at 28. But *Esicorp* is distinguishable. In *Esicorp*, Esicorp hired a laboratory testing company to "inspect and approve" shop welds that a different entity had manufactured. 193 F.3d at 968. Esicorp sued the laboratory testing company for negligence, alleging that the company had negligently tested and approved over four hundred defective shop welds. *Id.* Esicorp alleged that the laboratory testing company's negligent testing caused Esicorp to suspend its work and repair the defective shop welds. *Id.*

The laboratory testing company's insurance company, Liberty, had issued an insurance policy analogous to Coverage A in the instant case and argued in part at the district court that the exclusion for "property damage to your work arising out of [your work]" applied and that the laboratory testing company was thus excluded from coverage. *See id.* at 969-70, 970 n.2. The district court held, and the Eighth Circuit appears to have agreed, that the exclusion did not apply because the laboratory testing company's "work" was "the testing of the shop welds, not the welding itself." *See id.* at 970 n.2. Liberty

16

did not appeal this part of the district court decision. *Id.* Thus, this issue was not fully briefed and was not the focus of the case before the Eighth Circuit.

Even if Liberty had appealed this portion of the district court's decision, the laboratory testing company's "work" of testing the shop welds in *Esicorp* is different from Kut and Kill's "work" of fertilizing and treating customers' lawns. Esicorp hired the laboratory testing company to "inspect and approve" the welding—the laboratory testing company was not hired to do the welding. *See id.* at 968. When the laboratory testing company negligently approved defective welds, it did not damage its "work" because its "work" was not doing the welding. In other words, the laboratory testing company's "work" had nothing to do with building, maintaining, or repairing the welds, but rather only inspecting and approving them. *See id.*

Here, unlike in *Esicorp*, customers hired Kut and Kill to not just test and approve their lawns, but rather to make improvements upon the lawns—i.e., to fertilize and apply selective herbicide to the lawns. *See* Docket 21-5 at 1. Thus, when Kut and Kill improperly sprayed glyphosate on the customers' lawns, Kut and Kill damaged its "work." The Eighth Circuit's footnoted opinion in *Esicorp* does not change the court's analysis in the instant case.

Second, Kut and Kill cites the Fifth Circuit's decision in *Siplast, Inc. v. Emps. Mut. Cas. Co.*, 23 F.4th 486 (5th Cir. 2022). *See* Docket 38 at 23. But this holding is similarly distinguishable. In *Siplast*, an Archdiocese purchased a roof membrane system from a roofing manufacturer for a local school. *See Siplast*, 23 F.4th at 490. The roofing manufacturer guaranteed that the roof

17

membrane system would "remain in a watertight condition for a period of 20 years, commencing with the date hereof; or [the manufacturer] will repair the Roof Membrane/System at its own expense[.]" *Id.* The roof membrane system failed, causing not only damage to the roof but also water damage to the ceiling tiles and other water damage in the school. *See id.* at 490, 494-95. Deciding whether an identical exclusion of damages to "your work" applied, the Fifth Circuit observed that the water damage to the ceiling tiles and portions of the school other than the manufacturer's roof membrane did not constitute the manufacturer's "work," and thus was not excluded under the exclusion. *See id.* at 494-95.

Importantly, the manufacturer only promised to provide and maintain a working roof membrane—and made no promises regarding the well-being of the school as a whole. *See id.* at 490. Thus, the Fifth Circuit found that damage to the school's ceiling tiles and other areas outside of the roof membrane fell outside the manufacturer's "work." *See id.* at 494-95. Kut and Kill argues that *Siplast* supports its argument that "courts have distinguished between damages in the form of costs to replace sub-standard work and damage to the larger property caused by the faulty workmanship, with the former excluded and the latter covered." *See* Docket 38 at 23. But unlike the roof manufacturer in *Siplast* who promised to provide a working roof membrane without promising to ensure the well-being of the entire school, Kut and Kill promised to fertilize and apply selective herbicide to its customers' lawns. Kut and Kill's promise inherently embraces the well-being of the customers' lawns, and thus damage

to the customers' lawns necessarily damaged Kut and Kill's "work." A more apt analogy to *Siplast*, using the basic facts of this case, would be if Kut and Kill, while fertilizing its customers' lawns, accidentally sprayed glyphosate on its customers' flowers that were on the customers' porches. In the flower hypothetical, damage to the flowers is not damage to Kut and Kill's "work" because Kut and Kill was not hired to treat the flowers. But here, unlike the flower example, Kut and Kill's spraying of glyphosate on its customers' lawns damaged Kut and Kill's "work" because the customers hired Kut and Kill to fertilize and treat their lawns. In short, *Siplast* is analytically distinct from this instant case.

Kut and Kill's citation to *Zurich Am. Ins. Co. v. Sumter Hotel Grp. Ltd. P'ship*, 2007 U.S. Dist. LEXIS 29093, (D.S.C. Apr. 19, 2007) falls short for similar reasons. *See* Docket 38 at 24. In *Zurich*, a hotel sued CBU Enterprises for a defective paint job. *See Zurich*, 2007 U.S. Dist. LEXIS 29093, at *1, 3. The only injury that the hotel suffered consisted of "blistering and peeling of the defectively applied paint." *See id.* at 12. Although the hotel argued that the property damage also included the eventual need to replace the roof, the district court held that to be too speculative and thus not captured under the definition of "property damage" because "property damage" under the insurance contract required a physical injury. *See id.* at *13-14.

Kut and Kill highlights *Zurich's* language that discusses damage under the "your work" exclusion. Docket 38 at 24. Specifically, Kut and Kill relies on *Zurich's* remark that "[b]ecause the damages suffered to date extend only to the

19

defective paint job itself, they are . . . excluded under the "Your Work" exclusion." *See id.* (citing *Zurich*, 2007 U.S. Dist. LEXIS 29093, at *17). Kut and Kill appears to suggest that because this language focuses only on the damages suffered as a result of the defective paint job and not damage to any other property including the underlying roof, *Zurich* supports Kut and Kill's argument that the damage to the lawns is not damage to Kut and Kill's "work." But *Zurich* did not need to decide whether damage to the roof that flowed from a defective paint job could be considered CBU's "work," because the evidence submitted in the record was too speculative to demonstrate such damage. *See Zurich*, 2007 U.S. Dist. LEXIS 29093, at *13-14. Thus, Kut and Kill reads too much into the *Zurich* court's language.

Even if the court in *Zurich* intended to suggest that damage to the underlying roof would not constitute CBU's "work," Kut and Kill's fertilizer and herbicide "work" is different from the painting in *Zurich*. While it is true that both cases involve insureds performing a service upon an object that existed before such services, the services upon which the insureds performed differ in kind. A promise to paint a roof does not involve, much less imply, a promise to maintain the integrity of the roof. A defective paint job that happens to damage the underlying roof does not damage the roof painter's "work" because the "work" was limited to externally painting the roof. In contrast, a promise to fertilize and apply herbicide to a lawn implies a promise to help the lawn grow. Improper application of glyphosate resulting in the death (or severe damage) of customers' lawns damages the lawn company's "work" because the "work"

impliedly entailed maintaining the well-being of the customers' lawns. Thus, *Zurich* does not change the court's analysis.

Kut and Kill also cites *Cypress Point Condo. Ass'n, Inc. v. Adria Towers, LLC*, 143 A.3d 273 (N.J. 2016), which cited *Firemen's Ins. Co. of Newark v. Nat'l Union Fire Ins. Co.*, 904 A.2d 754 (N.J. 2006). Docket 38 at 24. Kut and Kill highlights that the New Jersey Supreme Court in *Fireman* distinguished between the "cost of replacing sub-standard firewalls" and the "damage to the rest of a building caused by faulty firewalls," such that the former was excluded from coverage while the latter was not. *See* Docket 38 at 24; *Firemen*, 904 A.2d at 759-60, 762. But *Fireman* did not rest its conclusion on the correct interpretation of "your work," but instead whether the damage of replacing the sub-standard firewalls constituted "property damage" such that it would trigger insurance coverage in the first place. *See Firemen*, 904 A.2d at 760, 762 ("We concur with [the trial court's] determination that there was no 'property damage' to effectuate coverage."). *Cypress* and *Firemen* also do not change the court's analysis.

The last case Kut and Kill cites is *French v. Assurance Co. of Am.*, 448 F.3d 693 (4th Cir. 2006). In *French*, a couple contracted with a home development corporation to construct a single-family home. *See id.* at 696. One of the subcontractors cladded the exterior of the home with a synthetic stucco system. *See id.* After completion of the home, the couple discovered extensive moisture and water damage to the home resulting from the defective cladding of the exterior of their home. *See id.* The district court denied insurance

coverage, relying on an exclusion in the contract that excluded property damage that was expected from the standpoint of the insured. *Id.* at 699.

The Fourth Circuit separated its analysis into two categories of damage: (1) damage to the defective synthetic stucco system and (2) damage to the non-defective structure and walls of the home directly resulting from the moisture intrusion through the defective exterior. *See id.* at 703. After concluding that the damage to the defective synthetic stucco system was not an occurrence (and thus excluded from coverage), the Fourth Circuit turned to the second category of damage. The Fourth Circuit suggested an analytical difference between damage to the defective synthetic stucco system and damage to the non-defective structure and walls of the home. *See id.* at 705. Specifically, the Fourth Circuit recognized that the damage caused to the flooring and non-defective structure of the house is "inherently different from coverage to correct the defective [synthetic stucco system] on the [couple's] home." *Id.*

But the Fourth Circuit decided the case not on whether the damage to the internal non-defective structure and walls of the home constituted the insured's "work," but rather whether the damage was a result of an "occurrence" and whether it fell under the expectation exclusion. *See id.* at 703-04. In fact, the Fourth Circuit's discussion of the "your work" exclusion actually supports United Fire's position in this case. In justifying finding no coverage for damages to the synthetic stucco system while finding coverage for damages to the internal non-defective structure and walls of the home, *French* specifically referenced the subcontractor exception to the "your work"

22

exclusion, stating that the exception "restore[d] otherwise excluded coverage." *See id.* at 706. Thus, *French* appears to recognize that, absent the fact that the damage resulted from a subcontractor, the damage to "your work" exclusion would have applied. *See id.* The court rejects Kut and Kill's final citation.

Citing *Bunkers v. Jacobson*, 653 N.W.2d 732, 738 (2002), Kut and Kill next reminds the court that this court should read Coverage A in a manner that gives effect and meaning to each term. *See* Docket 38 at 21. Kut and Kill then advances two arguments for why reading "your work" to include the damage to the customers' lawns would contravene the lesson in *Bunkers*. Neither argument persuades the court. Kut and Kill first argues that reading "your work" to include the damage to the customers' lawns renders another definition, "impaired property" to be "nonsensical." *See* Docket 38 at 21. Coverage A defines "impaired property" to mean:

> [T]angible property, other than . . . 'your work', that cannot be used or is less useful because:
>
> a. It incorporates . . . 'your work' that is known or thought to be defective, deficient, inadequate or dangerous; or
>
> b. You have failed to fulfill the terms of a contract or agreement;
>
> if such property can be restored to use by the repair, replacement, adjustment or removal of . . . 'your work' or your fulfilling the terms of the contract or agreement.

Docket 21-3 at 18. Coverage A excludes, among other things, " 'property damage' to 'impaired property' . . . arising out of . . . [a] defect, deficiency, inadequacy or dangerous condition in . . . 'your work[.]'" *See id.* at 10. According to Kut and Kill, "if the definition of 'your work' includes the property

upon which the work is performed[,] the definition of impaired property in the Policy . . . would include property in the definition of 'your work' but also exclude 'your work' from certain types of property." Docket 38 at 21. But "your work" includes tangible property such as "[m]aterials, parts or equipment furnished in connection with such work or operations." *See* Docket 21-3 at 21. Thus, the mere fact that the definition of "impaired property" begins with a broad category (tangible property) and then excludes some other property included in "your work" (i.e. equipment) is consistent and does not render it "nonsensical."

Relatedly, the court notes that the exclusion of damages to "your work" (i.e. exclusion l) and damages to "impaired property" (exclusion m) can exclude different items from coverage, even in the context of the property upon which an insured performs work. For example, a plumber hired to repair a sink that disperses water at an exceedingly slow rate who merely fails to adequately tighten a screw and such failure prevents the sink from dispersing water at all does damage to the underlying sink. But this damage would not damage the plumber's work because it is not inextricably linked with the sink—the plumber can reverse the damage by tightening the screw. Thus, the plumber's work is separable from the sink. In that case, coverage for the damage to the sink would not be excluded under exclusion l. *See* Docket 21-3 at 10.

This same damage to the sink, however, would be excluded under exclusion m (damage to impaired property). The sink is "impaired property" because it is "tangible property, other than . . . 'your work', that cannot be

used . . . because . . . [i]t incorporates . . . 'your work' that is known or thought to be defective . . ." and the sink "can be restored to use by the . . . adjustment . . . of . . . 'your work'[.]" *See id.* at 18. Exclusion m would apply because the impaired property (the sink) "ar[ose] out of . . . "a defect, deficiency [and] inadequacy . . . in 'your work.' " *See id.* at 10. This example shows that exclusion l can apply without exclusion m applying, and thus the two exclusions and related definitions can co-exist harmoniously without rendering one "nonsensical." The court rejects Kut and Kill's argument to the contrary.

Second, Kut and Kill points to exclusion j(5). Exclusion j(5) excludes "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations[.]" *See* Docket 21-3 at 10. This exclusion, Kut and Kill argues, "would not need to specify 'real property' on which the insured worked if '[your] work' included the property upon which it was conducted." Docket 38 at 21.

Setting aside the timing issue of when the property damage in exclusion j(5) must occur for such exclusion to apply, exclusions j(5) and l may have some overlap. But just because there may be some overlap does not mean the exclusions would be meaningless. A Venn diagram will do; two completely overlapping circles will not.

As Kut and Kill implicitly recognizes, j(5) only applies to *real property*, whereas exclusion l does not limit the kinds of property on which it may apply.

Thus, there are at least some instances in which exclusion j(5) is narrower in scope than exclusion l.

But exclusion j(5) is in some ways broader than exclusion l. Exclusion j(5) expressly provides that it applies to property damage that results from a subcontractor's work. *See* Docket 21-3 at 10. Conversely, exclusion l expressly states the opposite, providing that the exclusion "does not apply if the damaged work . . . was performed on your behalf by a subcontractor." *See id.* Changing just one fact in the instant case illustrates why these exclusions are not necessarily redundant. For example, if Kut and Kill's subcontractor sprayed the glyphosate instead of Kut and Kill itself, then exclusion j(5) would apply (and thus coverage would be excluded) but exclusion l would not apply. *See id.*

That exclusion j(5) is both narrower compared to exclusion l (in that j(5) applies only to real property whereas l does not have such limitation) and broader (in that j(5)'s exclusion includes damage that arises from subcontractors, while exclusion l expressly does not apply to damage that arises from subcontractors), likely reflects United Fire's careful balancing when deciding which risks it would be willing to assume when it issued the insurance coverage. *Cf. AMCO Ins. Co. v. Emps. Mut. Cas. Co.*, 845 N.W.2d 918, 923-24 (S.D. 2014) ("[I]nsurance companies 'may word the insurance contract so as to' make 'the test for coverage narrower' "(quotations omitted)).

In short, overlap in exclusion j(5) and exclusion l's description of what property is sufficient for the exclusions to apply may meet in between two circles (i.e. inside the Venn diagram), but the two exclusions do not completely

overlap due to their divergent treatment of real property and acts of
subcontractors. The court rejects Kut and Kill's final argument.

In summary, the court finds that putting aside the products completed
operations hazard requirement, exclusion l applies because Kut and Kill's
spraying of glyphosate damaged Kut and Kill's work.

### C. Products Completed Operations Hazard

Exclusion j(6) "does not apply to 'property damage' included in the
'products-completed operations hazard.' " Docket 21-3, at 10. Kut and Kill
disputes when precisely the property damage to Kut and Kill's customers'
lawns occurred. *See* Docket 24 at 22-24; Docket 20 at 18-21. According to Kut
and Kill, "every proper point of evidence indicates that the glyphosate does not
immediately injure the plant, and that it may be washed off for at least several
hours thereafter, supported by past general experience, and experience
specifically in this case." *See* Docket 24 at 21. Kut and Kill supports its
argument by highlighting the fact that its customers began complaining only
two weeks after Kut and Kill had sprayed RangerPro on the customers' lawns.
*See* Docket 24 at 17-24; Docket 25 ¶¶ 1-4; Docket 31 ¶¶ 1-4. Kut and Kill also
submitted an affidavit of Tate Eining, President of Kut and Kill, in which Eining
described at least on incident where "a property was inadvertently sprayed with
glyphosate on 4/22/22, and irrigation was turned on 5/4/22, with no
reseeding and resodding, and the grass on that property is and was fully
healthy." *See* Docket 25 ¶ 6; Docket 31 ¶ 6 (disputing only the materiality of
this fact). Further, Kut and Kill submitted a Ranger Pro product label that

warns that "[r]ainfall within 4 hours of application could wash this product off of the foliage and a second application might then be needed to achieve acceptable weed control." Docket 21-4 at 36. In sum, Kut and Kill argues, the property damage (i.e. the damage to the lawns) occurred sometime *after* Kut and Kill had completed its work and thus the damage is included in the "products completed operations hazard." *See* Docket 24 at 20-21.

In contrast, United Fire argues that the property damage in this case falls outside the "products completed operations hazard" because the damage to the lawn occurred "while the spray was being applied." *See* Docket 36 at 8. United Fire points to Ranger Pro's label, which states that "[t]his product moves through the plant from the point of foliage contact to and into the root system." *See* Docket 36 at 7-8; Docket 21-4 at 36. United Fire also cites *Brake*, a case that similarly dealt with whether a landscaping company's accidental spraying of a chemical damaged the lawn at the moment the spray hit the lawn or at some later time. *See* 625 F.3d at 1021, 1024-25.[8]

But determining whether the property damage falls under the "products completed operations hazard" is immaterial when determining the applicability

---

[8] Importantly in *Brake*, the parties "d[id] not dispute that after [the chemical] was applied, the death of the vegetation was inevitable and irreversible, even though it took several days to manifest." *Brake*, 625 F.3d at 1024. In light of the factual scenario in *Brake*, the Eighth Circuit concluded that the company "damaged the lawns at the moment he sprayed them[.]" *Id.* But here, as explained above, Kut and Kill has submitted evidence to suggest that a reasonable jury could find the death of the lawn was not inevitable or irreversible at the moment glyphosate touched the lawn. For reasons explained below, however, this issue makes no difference in the ultimate outcome of the case.

of Coverage A, so long as the other provisions of j(6) and l are otherwise met. In other words, assuming the provisions of exclusions j(6) and l are otherwise satisfied, either the j(6) or l exclusion will necessarily apply because exclusion j(6) and l are inversely related. If the property damage falls under the "products operations hazard," then exclusion l applies (assuming all other provisions of exclusion l are met) and exclusion j(6) does not. *See* Docket 21-3 at 10. Conversely, if the property damage does not fall under the "products operations hazard," then exclusion j(6) applies (assuming all other provisions of exclusion j(6) are met), and exclusion l does not. *See id.*

The District Court for the District of Arizona observed the same, stating:

> Therefore, the combination of . . . exclusion j(6), exclusion (l), and the products-completed operations hazard seemingly preclude any coverage for the Incident whether or not Sunwestern's work was completed. If it was completed, it is excluded by exclusion (l). If it was not completed, it is excluded by exclusion[] . . . j(6).

*Sunwestern Contractors Inc. v. Cincinnati Indem. Co.*, 390 F.Supp.3d 1009, 1018-19 (D. Ariz. 2019).

Based on the above analysis, Kut and Kill is excluded from coverage under Coverage A in this case. If the glyphosate damaged the grass immediately upon contact (i.e. is not included in the "products completed operations hazard"), then exclusion (j)(6) applies. *See* Docket 27-3 at 10. But if the glyphosate damaged the grass at some later time after the work has been completed (i.e. is in the products completed operations hazard), then exclusion l applies. The record may indicate a genuine dispute in fact as to when glyphosate damaged the grass, and thus whether the damage fell under the

"products completed operations hazard," but as discussed above, this issue is not material because the resolution of such dispute does not impact the ultimate outcome of the case. *See Erickson v. Nationstar Mortg., LLC*, 31 F.4th 1044, 1048 (8th Cir. 2022) ("A fact is 'material' if it may 'affect the outcome of the suit.' ") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Either way, the policies exclude coverage. *See Sunwestern*, 390 F.Supp.3d at 1018-19.

This conclusion aligns with general construction commercial insurance principles, namely that "liability insurance should not be a warranty or performance bond for general contractors because they control their work." *Corner Constr. Co. v. U.S. Fid. and Guar. Co.*, 638 N.W.2d 887, 892 (S.D. 2002) (quoting *Fireguard Sprinkler Sys., Inc.*, 864 F.2d 648, 650 (9th Cir. 1988)). Indeed, "[c]ommercial general liability policies are not designed to insure against an insured's own faulty workmanship, which is a normal risk associated with operating a business." Steven Plitt et al., *Crouch on Insurance* § 129:17 (3d ed.). While these principles cannot override the plain terms of a policy, the court here finds that Kut and Kill's losses to its customers' lawns are not covered under the unambiguous language of the policies. *Cf. Lowery Contr. & Concrete, LLC v. Owners Ins. Co.*, 901 N.W.2d 481, 487 (S.D. 2017).

Thus, the court grants United Fire's partial motion for summary judgment on Count II of Kut and Kill's Complaint and Count I of United Fire's Counterclaim. For the same reasons, the court denies Kut and Kill's partial motion for summary judgment.

## V.    Conclusion

For the above reasons, it is ORDERED:

(1) That Kut and Kill's partial motion for summary judgment (Docket 23)

is DENIED; and

(2) That United Fire's partial motion for summary judgment (Docket 18)

is GRANTED.

Dated September 13, 2023.

BY THE COURT:

*/s/ Karen E. Schreier*
UNITED STATES DISTRICT JUDGE